**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | Case No.   **2:19-cv-305** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **ONE HUNDRED THIRTY THOUSAND** | : | <u>**VERIFIED COMPLAINT FOR**</u> |
| **AND 00/100 DOLLARS ($130,000.00) IN** | : | <u>**FORFEITURE IN REM**</u> |
| **UNITED STATES CURRENCY,** | : | |
| | : | |
| **Defendant 1,** | : | |
| | : | |
| **and** | : | |
| | : | |
| **SIXTY THOUSAND AND 00/100** | : | |
| **DOLLARS ($60,000.00) IN UNITED** | : | |
| **STATES CURRENCY,** | : | |
| | : | |
| **Defendant 2.** | : | |

Plaintiff, United States of America, by its undersigned counsel, alleges the following for

its action against the defendants in accordance with Supplemental Rule G(2) of the Federal Rules

of Civil Procedure.

<u>**NATURE OF THE ACTION**</u>

1.     This is a civil action *in rem* brought to enforce 21 U.S.C. § 881(a)(6), which

provides for the forfeiture to the United States of:

> All moneys, negotiable instruments, securities, or other things of value furnished
> or intended to be furnished by any person in exchange for a controlled substance or
> listed chemical in violation of this subchapter, all proceeds traceable to such an
> exchange, and all moneys, negotiable instruments, and securities used or intended
> to be used to facilitate any violation of this subchapter.

<u>**THE DEFENDANTS IN REM**</u>

2.     Defendant 1 is One Hundred Thirty Thousand and 00/100 Dollars ($130,000.00) in

United States currency. The Drug Enforcement Administration seized Defendant 1 on or about September 11, 2018, from Fuad Sheikh Omer's checked bag, following a consensual encounter with him at the John Glenn Columbus International Airport. Defendant 1 has been deposited into the Seized Asset Deposit Fund, where it will remain during the pendency of this action.

3.     Defendant 2 is Sixty Thousand and 00/100 Dollars ($60,000.00) in United States currency. The Drug Enforcement Administration seized Defendant 2 on or about September 11, 2018, from Bilal Adam Abdulkadir's checked bag, following a consensual encounter with him at the John Glenn Columbus International Airport. Defendant 2 has been deposited into the Seized Asset Deposit Fund, where it will remain during the pendency of this action.

## JURISDICTION AND VENUE

4.     Plaintiff brings this action *in rem* in its own right to forfeit and condemn the defendants under 21 U.S.C. § 881(a)(6). This Court has subject matter jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345 and over an action for forfeiture under 28 U.S.C. § 1355(a).

5.     This Court has *in rem* jurisdiction over the defendants under 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture occurred in the Southern District of Ohio.

6.     Venue is proper in this district under 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture occurred in the Southern District of Ohio and under 28 U.S.C. § 1395 because the defendants were seized in the Southern District of Ohio.

## BASIS FOR FORFEITURE

7.     The defendants are subject to forfeiture under 21 U.S.C. § 881(a)(6) because they represent property furnished or intended to be furnished in exchange for a controlled substance,

represent proceeds traceable to such an exchange, or were used or intended to be used to facilitate any violation of 21 U.S.C. § 841 or a conspiracy to commit such offense, in violation of 21 U.S.C. § 846.

## FACTS

8.     On September 11, 2018, the Columbus, Ohio Airport Drug Enforcement Administration ("DEA") Group at John Glenn Columbus International Airport ("CMH") received information regarding the suspicious travel of two passengers identified as Fuad Sheikh Omer ("Omer") and Bilal Adam Abdulkadir ("Abdulkadir").

a.     Members of the Columbus, Ohio Airport DEA Group are trained and experienced and know that persons engaged in the commercial interstate distribution of controlled substances frequently use CMH and the aircraft that arrive and depart there to transport drug sales proceeds and funds to be used to purchase drugs in and out of Columbus.    Those proceeds and funds are usually in the form of United States currency.

b.     Members of the Columbus, Ohio Airport DEA Group are trained and experienced and know that persons engaged in the commercial interstate distribution of controlled substances frequently use couriers to transport controlled substances, drug sales proceeds, and funds to be used to purchase drugs in and out of Columbus.    CMH and the aircraft that arrive and depart there are relied upon as a means of sending and receiving such couriers.

c.     Members of the Columbus, Ohio Airport DEA Group are trained and experienced in investigating illegal drug and drug currency couriers, and they have learned to observe and detect the behavior, characteristics, and other travel

3

indicators which help them to distinguish suspected illegal drug and drug currency couriers from the normal, non-criminal traveling public.

      d.    Members of the Columbus, Ohio Airport DEA Group are trained and experienced and know that illegal drug and drug currency couriers often purchase airline tickets within 72 hours of travel to a known source area for illegal drugs like Los Angeles, California, or to a known destination area for illegal drugs like Columbus, Ohio. The members of the Columbus, Ohio Airport DEA Group also know that illegal drug and drug currency couriers often will purchase one-way tickets because the date of their return is not immediately known.

      e.    DEA Special Agent Jonathan Hanley ("SA Hanley"), Task Force Officer Andrew D'Orazio ("TFO D'Orazio"), and DEA Task Force Officer Eric Doyle ("TFO Doyle") are members of the Columbus, Ohio Airport DEA Group.

9.    Omer and Abdulkadir each intended to depart Columbus, Ohio, on a one-way ticket on American Airlines Flight #2102 to Los Angeles, California. The flight was scheduled to leave Columbus, Ohio, at approximately 4:37 p.m. on September 11, 2018. Both tickets were purchased the night before the flight and were booked through Alaskan Airlines, a partner airline. Based on this information, investigators believed that Omer and Abdulkadir were traveling together.

10.    At approximately 4:10 p.m. on September 11, 2018, SA Hanley and TFO D'Orazio arrived at the gate assigned to American Airlines Flight #2102 and located Omer and Abdulkadir. Around the same time, TFO Doyle made contact with America Airlines, verified that Omer and Abdulkadir each had checked a bag, and located the checked bags.

11.    TFO D'Orazio observed that Omer and Abdulkadir were not sitting together or

4

directly interacting, but they appeared to be covertly watching each other, and their behavior suggested that they were communicating via text or other messaging service on their cellular telephones.

12.     At approximately 4:30 p.m., SA Hanley and TFO D'Orazio observed Omer and Abdulkadir proceed to the back of the boarding line.   Once Omer's ticket was accepted, TFO D'Orazio followed Omer into the jet bridge to speak to him.   TFO D'Orazio approached Omer in a way as not to block his egress, identified himself as a law enforcement officer, displayed his credentials, advised Omer that he was not in trouble and was free to leave, and asked if he would speak to him.   Omer stopped and agreed to speak with TFO D'Orazio.

13.     When asked about his travel, Omer advised that he was in Columbus for a short time to visit a friend.   TFO D'Orazio then asked Omer for consent to search his carry-on bag and his checked bag.   Omer consented.   In Omer's carry-on bag, TFO D'Orazio observed a bundle of currency and asked Omer what the money was for.   Omer immediately asked for his bag back, said he had changed his mind, and advised that he did not give consent for the officer to search his bags.

14.     After Omer withdrew his consent, TFO D'Orazio handed the carry-on bag back to Omer.   TFO D'Orazio then advised Omer that his checked bag would be detained pending a search warrant and asked Omer if he would like to accompany him to obtain a receipt for the checked bag.   Omer became very upset but followed TFO D'Orazio out of the jet bridge.

15.     While TFO D'Orazio was speaking with Omer in the jet bridge, SA Hanley stopped Abdulkadir by the ticket counter.   SA Hanley approached Abdulkadir in a way as not to block his egress, identified himself as a law enforcement officer, displayed his credentials, advised Abdulkadir that he was not in trouble and was free to leave, and asked if he would speak to him.

Abdulkadir stopped and agreed to speak with SA Hanley.

16.     When asked the reason for his travel, Abdulkadir told SA Hanley that he had been in Columbus for only about four hours to visit a friend and was now flying to Los Angeles, California.   Abdulkadir could not provide any information about the friend.

17.     SA Hanley then asked Abdulkadir if he had checked any bags with American Airlines.   Abdulkadir hesitated and then confirmed that he had checked a bag.   When asked if he had any contraband or large amounts of currency on his person or in his checked bag, Abdulkadir advised that he had $60,000.00 in United States currency in his luggage.

18.     TFO D'Orazio and Omer emerged from the jet bridge and approached the area where SA Hanley and Abdulkadir were talking.   As they approached the area, Abdulkadir overheard that Omer had withdrawn his consent to search his checked bag.   Abdulkadir looked at Omer and then turned to SA Hanley and advised, "I don't want to give consent either."

19.     After hearing this and observing their behavior, SA Hanley asked Abdulkadir and Omer if they knew each other.   They denied knowing each other.

20.     SA Hanley advised Abdulkadir and Omer that their checked bags were going to be detained pending further investigation and that they were free to board their flight or come to the DEA's airport office to speak with officers further.   SA Hanley also advised that the officers would request assistance from a narcotic detection K-9 to perform an open-air sniff of their luggage.   Both Abdulkadir and Omer declined to accompany the officers to the DEA's airport office and refused to sign a receipt for their property.   Abdulkadir and Omer boarded their flight.

21.     TFO Doyle secured the checked bags in the DEA's airport office.   The bag checked by Abdulkadir was a soft-sided black roller bag with a diamond pattern imprinted on the fabric.   The bag checked by Omer was a soft-sided purple roller bag.

22.     Once the bags were secured, the officers requested assistance from Columbus Regional Airport Authority Police K-9 Officer Dale Beam ("Officer Beam") and K-9 "TRex" to conduct a narcotic detection K-9 sniff of assorted bags at the DEA's office.

a.     Upon arriving at the DEA office, Officer Beam found that the officers had placed eight bags of assorted sizes and colors in a line on the office floor.   The officers included Omer's purple roller bag in the lineup.   Officer Beam and K-9 TRex entered the room and conducted a sniff of the bags. According to Officer Beam, K-9 TRex showed a positive alert for the odor of narcotics on a large purple roller bag by squaring up to the bag, sniffing the bag more closely, placing his front paws on top of the bag, and then scratching the bag. Officer Beam advised the officers that K-9 TRex alerted to a large purple roller bag for the odor of narcotics and left the area.

b.     After Officer Beam and K-9 TRex left the room, the officers emerged and asked Officer Beam and K-9 TRex to conduct a second sniff.   Officer Beam and K-9 TRex reentered the room and found that the officers had placed eight bags of assorted sizes and colors in a half circle on the office floor.   This time, officers included Abdulkadir's black roller bag with a diamond pattern in the lineup.   Officer Beam and K-9 TRex conducted a sniff of the bags.   According to Officer Beam, K-9 TRex showed a positive alert for the odor of narcotics on a midsize brown/black roller bag with a diamond pattern by squaring up to the bag, sniffing the bag more closely, placing his front paws on top of the bag, and then scratching the bag.   Officer Beam advised the officers that K-9 TRex alerted to the midsize brown/black roller bag that had a diamond pattern on it for the odor of

narcotics and left the area.

23.     Following the positive narcotic K-9 alerts to Omer's and Abdulkadir's checked bags, TFO Doyle obtained search warrants for the bags from Franklin County Municipal Court Judge Eileen Y. Paley.

24.     TFO Doyle, TFO D'Orazio, and SA Hanley began to search Omer's and Abdulkadir's checked bags after obtaining the search warrants.   In Omer's bag, officers found clothing, towels, and minimal toiletries.   Upon further inspection, the officers discovered numerous rubber-banded bundles of United States currency, hidden inside the pockets of multiple pairs of pants.

25.     While looking through the contents of Omer's bag, the officers also noted that some of the clothing in the bag appeared to be too small to fit Omer, who is known by the officers to be approximately six feet, one inch tall.   A tag on a pair of jeans in his bag was marked size "4P."

26.     An official count of the United States currency hidden in Omer's bag revealed that the currency totaled $130,000.00 (Defendant 1), which is further detailed below.

| DENOMINATION | QUANTITY |
| --- | --- |
| $100 | 318 |
| $50 | 291 |
| $20 | 4,159 |
| $10 | 45 |
| $5 | 4 |

27.     The officers next searched Abdulkadir's bag.   Officers found that it was packed similarly to Omer's bag and held clothing, towels, and minimal toiletries.   Upon further inspection, the officers discovered numerous rubber-banded bundles of United States currency,

8

hidden inside the pockets of multiple pairs of pants and among the towels in the bag.

28.     Officers found a folder, which contained additional rubber-banded bundles of United States currency, under the lining of Abdulkadir's bag.   The folder also contained a "Certificate of Completion" from Alaskan Airlines, bearing Abdulkadir's name.

29.     Following the searches of Omer's and Abdulkadir's checked bags, the officers placed a copy of the warrant and a receipt for the seized currency in each bag and took the bags to American Airlines for return to Omer and Abdulkadir.

30.     An official count of the United States currency hidden in Abdulkadir's bag revealed that the currency totaled $60,000.00 (Defendant 2), which is further detailed below.

| DENOMINATION | QUANTITY |
|---|---|
| $100 | 106 |
| $50 | 56 |
| $20 | 2,257 |
| $10 | 108 |
| $5 | 76 |

31.     Based on their training and experience, the officers know that this type of deliberate concealment of United States currency is indicative of bulk transportation of illegal drug proceeds. Therefore, the officers requested assistance from Officer Beam and K-9 "TRex" to conduct a narcotic detection K-9 sniff on packages that contained the seized currency.

32.     The money seized from Omer's bag was placed in a new United States Postal Service Priority Mail package ("USPS package") and sealed.   The narcotic detection K-9 sniff consisted of two separate K-9 sniffs as follows.

        a.     Ten USPS packages were placed in a circle in the DEA office.

Five of the packages were empty, and five contained shredded, circulated currency. Officer Beam and K-9 TRex entered the office and conducted a sniff of the ten packages. K-9 TRex did not show a change in behavior in the room or on the ten packages. Officer Beam and K-9 TRex then left the area.

b. The DEA officers replaced one of the packages with the USPS package that contained the money from Omer's bag. The location of the money was unknown to Officer Beam. Officer Beam and K-9 TRex returned to the room and conducted a sniff of the packages. K-9 TRex showed a positive alert for the odor of narcotics on one of the packages by squaring up to the package, placing his front paws on top of the package, and then scratching the package. The DEA officers advised Officer Beam that it was the package containing the money seized from Omer's bag.

33. Office Beam and K-9 TRex left the area and the money seized from Abdulkadir's bag was placed in a new United States Postal Service Priority Mail package ("USPS package") and sealed. This second narcotic detection K-9 sniff also consisted of two separate K-9 sniffs as follows.

a. Ten USPS packages were placed in a circle in the DEA office. Five of the packages were empty, and five contained shredded, circulated currency. Officer Beam and K-9 TRex entered the office and conducted a sniff of the ten packages. K-9 TRex did not show a change in behavior in the room or on the ten packages. Officer Beam and K-9 TRex then left the area.

b. The DEA officers replaced one of the packages with the USPS package that contained the money from Abdulkadir's bag. The location of the

money was unknown to Officer Beam. Officer Beam and K-9 TRex returned to the room and conducted a sniff of the packages. K-9 TRex showed a positive alert for the odor of narcotics on one of the packages by sniffing the package, pouncing on top of the package with his front paws, and then scratching the package. The DEA officers advised Officer Beam that it was the package containing the money seized from Abdulkadir's bag.

34. A review of records from Southwest Airlines revealed that on April 13, 2018, Omer flew to Columbus, Ohio, from San Diego, California. He flew back to San Diego, California, on April 17, 2018. Both of Omer's flights were booked using an email address of AhmedAbdirahim1@gmail.com and a phone number of (619) 632-1036.

35. Through additional investigation, SA Hanley discovered that the phone number used on Omer's flight reservations on Southwest Airlines was linked to another seizure at CMH. On or about June 22, 2018, TFOs Doyle and D'Orazio approached Ahmed Abdirahim ("Abdirahim") at CMH after learning that he had booked a same-day, one-way flight from Columbus, Ohio, to San Diego, California. Abdirahim used the phone number of (619) 632-1036 when he booked the flight. During the encounter, the officers discovered and seized a total of $83,980.00 in United States currency that Abdirahim had concealed inside two speakers in his carry-on bag.

36. Members of the Columbus, Ohio Airport DEA Group also learned that members of the San Diego Narcotic Task Force at the San Diego, California International Airport spoke to Fuad Omer in June 2016. Specifically, the San Diego Narcotic Task Force had received a tip about the suspicious travel of an individual identified as Mohamed Omer. While speaking with Mohamed Omer in the area of the baggage carousel for his incoming flight, the officers noticed

11

another male loitering in the same area.   After speaking with the man, they learned that he was Fuad Omer, the brother of Mohamed Omer.   The officers observed that while Fuad Omer and Mohamed Omer were not directly interacting, they appeared to be communicating with each other via their cellular telephones.   The officers noted that Fuad Omer, like Mohamed Omer, was generally uncooperative during their interaction and asked if he was under arrest, was being detained, or was free to leave.   Although Fuad Omer initially denied that Mohamed Omer was his brother, he eventually stated that he was at the airport to pick up his brother who he identified as Mohamed Omer.   The officers noted that Fuad Omer and Mohamed Omer did not leave the airport together and that they left the airport in different cars.

37.    Following their interaction with Fuad Omer and Mohamed Omer, members of the San Diego Narcotic Task Force learned that agents at the San Diego International Airport previously had seized $9,000.00 from Mohamed Omer in 2014.   Based upon their investigation, observations, and interactions, members of the San Diego Narcotic Task Force believed that Fuad Omer and Mohamed Omer were involved in criminal activity.

38.    Omer's criminal history includes, among other things, a 2013 arrest in San Diego, California, for selling or furnishing marijuana, possession of marijuana for sale, and conspiracy to commit a crime.

39.    On November 2, 2018, the DEA received a claim from Omer asserting an interest in Defendant 1.   In his claim, Omer asserted that he is the lawful owner of the seized currency, but he did not provide any documentation in support of his claim or any explanation for the source of the $130,000.00.

40.    The DEA also received a claim from Abdulkadir on November 2, 2018, asserting an interest in Defendant 2.   In his claim, Abdulkadir asserted that "he is the owner of and has a

possessory interest in" the seized currency. Abdulkadir did not provide any documentation in support of his claim or any explanation for the source of the $60,000.00.

41. Based on the forgoing facts, the United States asserts that the defendants, $130,000.00 in United States currency (Defendant 1) and $60,000.00 in United States currency (Defendant 2), represent property furnished or intended to be furnished in exchange for a controlled substance, represent proceeds traceable to such an exchange, or were used or intended to be used to facilitate any violation of 21 U.S.C. § 841 or a conspiracy to commit such offense, in violation of 21 U.S.C. § 846. Therefore, the property is subject to forfeiture to the United States under 21 U.S.C. § 881(a)(6).

## **CLAIM FOR RELIEF**

WHEREFORE, the plaintiff respectfully requests that:

(a) pursuant to Rule G(3)(b)(i), Supplemental Rules, the Clerk issue a warrant of arrest *in rem*, directing the United States to arrest and seize the defendants and to retain the same in its custody subject to further order of the Court;

(b) the Court, pursuant to Rule G(4), Supplemental Rules, direct the United States to give notice to all persons and entities having an interest in the defendants to assert, in conformity with the law, a statement of any interest they may have, including notice by publication on the official government website, www.forfeiture.gov, for 30 consecutive days;

(c) the forfeiture of the defendants to the United States be confirmed, enforced, and ordered by the Court;

(d) the Court thereafter order the United States to dispose of the defendants as provided by law; and

(e) the Court award the United States all other relief to which it is entitled, including

the costs of this action.

Respectfully submitted,

BENJAMIN C. GLASSMAN
United States Attorney

s/Deborah D. Grimes

DEBORAH D. GRIMES (0078698)
Assistant United States Attorney
Attorney for Plaintiff
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
(513) 684-3711 / Fax (513) 684-6385
Deborah.Grimes@usdoj.gov

## **VERIFICATION**

I, Eric M. Doyle, hereby verify and declare under the penalty of perjury that I am a Task Force Officer with the Drug Enforcement Administration, that I have read the foregoing Verified Complaint for Forfeiture *In Rem* and know the contents thereof, and that the matters contained in the complaint are true to my own knowledge, except those matters stated to be alleged on information and belief and as to those matters, I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, and my investigation of this case.

I hereby verify and declare under the penalty of perjury that the foregoing is true and correct.

_____1-31-19_____
Date

_____
ERIC M. DOYLE, Task Force Officer
Drug Enforcement Administration

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| United States of America | One Hundred Thirty Thousand and 00/100 Dollars ($130,000.00) in United States Currency, et al. |

**(b)** County of Residence of First Listed Plaintiff    Franklin
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Franklin
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Deborah D. Grimes, Assistant United States Attorney
221 E. Fourth Street, Suite 400
Cincinnati, Ohio 45202    (513) 684-3711

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1   U.S. Government Plaintiff
☐ 2   U.S. Government Defendant
☐ 3   Federal Question *(U.S. Government Not a Party)*
☐ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*   and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**   **PERSONAL INJURY** | ☒ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane   ☐ 365 Personal Injury – | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product    Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument |    Liability   ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &    Pharmaceutical | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
|    & Enforcement of Judgment |    Slander    Personal Injury | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'    Product Liability | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted |    Liability   ☐ 368 Asbestos Personal | |    New Drug Application | ☐ 470 Racketeer Influenced and |
|    Student Loans | ☐ 340 Marine    Injury Product | | ☐ 840 Trademark |    Corrupt Organizations |
|    (Excludes Veterans) | ☐ 345 Marine Product    Liability | | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment |    Liability   **PERSONAL PROPERTY** | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
|    of Veteran's Benefits | ☐ 350 Motor Vehicle   ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle   ☐ 371 Truth in Lending |    Act | ☐ 863 DIWC/DIWW (405(g)) |    Exchange |
| ☐ 190 Other Contract |    Product Liability   ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal    Property Damage |    Relations | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise |    Injury   ☐ 385 Property Damage | ☐ 740 Railway Labor Act | | ☐ 893 Environmental Matters |
| | ☐ 362 Personal Injury -    Product Liability | ☐ 751 Family and Medical | | ☐ 895 Freedom of Information |
| |    Medical Malpractice |    Leave Act | **FEDERAL TAX SUITS** |    Act |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights   **Habeas Corpus:** | ☐ 791 Employee Retirement |    or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 220 Foreclosure | ☐ 441 Voting   ☐ 463 Alien Detainee |    Income Security Act | ☐ 871 IRS—Third Party |    Act/Review or Appeal of |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment   ☐ 510 Motions to Vacate | |    26 USC 7609 |    Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/    Sentence | | | ☐ 950 Constitutionality of |
| ☐ 245 Tort Product Liability |    Accommodations   ☐ 530 General | | |    State Statutes |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -   ☐ 535 Death Penalty | **IMMIGRATION** | | |
| |    Employment   **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities -   ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| |    Other   ☐ 550 Civil Rights |    Actions | | |
| | ☐ 448 Education   ☐ 555 Prison Condition | | | |
| |   ☐ 560 Civil Detainee - | | | |
| |    Conditions of | | | |
| |    Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation – Transfer
☐ 8 Multidistrict Litigation – Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Forfeiture pursuant to 21 U.S.C. § 881(a)(6)
Brief description of cause:
Forfeiture

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $      CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE       DOCKET NUMBER

DATE   1/31/19     SIGNATURE OF ATTORNEY OF RECORD   *Deborah D. Grimes*

**FOR OFFICE USE ONLY**

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE